# EXHIBIT D

**From:**            Dan Edward <dedward@radshield.com>
**Sent:**            Tuesday, December 3, 2019 2:15 PM
**To:**              Maysoon Hasan
**Cc:**              Naji Al-Fanjery; Syed R. Maswood
**Subject:**         Re: Rev B of  NATS PO # 909103 for 1500 pcs/ Tech Flow
**Attachments:**     NATS DA.pdf; NATS NDA.pdf

**Follow Up Flag:**  Follow up
**Flag Status:**     Flagged

Here is our NDA and DA, soon as I receive it back I'll issue the invoice!

**Dan Edward | Director of Sales & Business Development | RST Radiation Shield Technologies, Inc.**
**866 7 Demron (866-733-6766) ext 110 | Skype: DEdwardRST | dedward@radshield.com**
**Direct Line: 305.774.6075**
**Cell: 786.519.6167**
I find the harder I work the more luck I seem to have.-Thomas Jefferson



Radiation Shield Technologies

**From:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>
**Date:** Wednesday, November 27, 2019 at 2:46 PM
**To:** Dan Edward <dedward@radshield.com>
**Cc:** Naji Osman <naji@techflow.com.sa>, "S. Maswood" <SMaswood@nats-usa.com>
**Subject:** RE: Rev B of NATS PO # 909103 for 1500 pcs/ Tech Flow

NATS

Yours Sincerely,

*Maysoon R. Hasan*

Area Manager

NATS, Incorporated

511 Centerpoint Drive

Middletown, CT 06457

U.S.A.

www.nats-usa.com

☎ **office**: +1-860-635-6820 Ext.111

**fax:** +1-860-635-4962

e-mail: maysoon.hasan@nats-usa.com

   

*Innovative Solutions in Radiation Detection & Analysis*
*Your Single Stop for All Radiation Detection Solution*

---

**From:** Dan Edward <dedward@radshield.com>
**Sent:** Wednesday, November 27, 2019 2:39 PM
**To:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>
**Cc:** Naji Al-Fanjery <naji@techflow.com.sa>; Syed R. Maswood <SMaswood@nats-usa.com>
**Subject:** Re: Rev B of NATS PO # 909103 for 1500 pcs/ Tech Flow

I will do! We need an NDA in place with NATS and Tech Flow. Who will be the person signing for each company and their title?

**Dan Edward | Director of Sales & Business Development | RST Radiation Shield Technologies, Inc.**
**866 7 Demron (866-733-6766) ext 110 | Skype: DEdwardRST | dedward@radshield.com**
**Direct Line: 305.774.6075**
**Cell: 786.519.6167**
I find the harder I work the more luck I seem to have.-Thomas Jefferson



---

**From:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>
**Date:** Wednesday, November 27, 2019 at 2:35 PM
**To:** Dan Edward <dedward@radshield.com>
**Cc:** Naji Osman <naji@techflow.com.sa>, "S. Maswood" <SMaswood@nats-usa.com>
**Subject:** Rev B of NATS PO # 909103 for 1500 pcs/ Tech Flow

Dear Dan,

Apologize, it is a typo.

Pursue to your agreement below, I attached Rev B of NATS PO # SA-909103. please send us your company invoice to remit payment.
Naji has agreed to extend the delivery to 4 months. Please expedite the order

Yours Sincerely,

*Maysoon R. Hasan*

Area Manager

NATS, Incorporated

511 Centerpoint Drive

Middletown, CT 06457

U.S.A.

**www.nats-usa.com**

☎ **office**: +1-860-635-6820 Ext.111

**fax:** +1-860-635-4962

e-mail: maysoon.hasan@nats-usa.com

   

*Innovative Solutions in Radiation Detection & Analysis*
*Your Single Stop for All Radiation Detection Solution*

---

**From:** Dan Edward <dedward@radshield.com>
**Sent:** Wednesday, November 27, 2019 2:29 PM
**To:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>
**Cc:** Naji Al-Fanjery <naji@techflow.com.sa>; Syed R. Maswood <SMaswood@nats-usa.com>
**Subject:** Re: NATS PO # 909103 for 1500 pcs/ Tech Flow

65% net 30 is 35% deposit. Your PO shows 23%

**Dan Edward | Director of Sales & Business Development | RST Radiation Shield Technologies, Inc.**
**866 7 Demron (866-733-6766) ext 110 | Skype: DEdwardRST | dedward@radshield.com**
**Direct Line: 305.774.6075**
**Cell: 786.519.6167**
I find the harder I work the more luck I seem to have.-Thomas Jefferson



Radiation Shield Technologies

**From:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>
**Date:** Wednesday, November 27, 2019 at 2:16 PM
**To:** Dan Edward <dedward@radshield.com>
**Cc:** Naji Osman <naji@techflow.com.sa>, "S. Maswood" <SMaswood@nats-usa.com>
**Subject:** RE: NATS PO # 909103 for 1500 pcs/ Tech Flow

Dear Dan,

Pursue to your agreement below, I attached Rev A of NATS PO # SA-909103. please send us your company invoice to remit payment.
Naji has agreed to extend the delivery to 4 months. Please expedite the order


Yours Sincerely,

*Maysoon R. Hasan*

Area Manager

NATS, Incorporated

511 Centerpoint Drive

Middletown, CT 06457

U.S.A.

www.nats-usa.com

☎ **office:** +1-860-635-6820 Ext.111

**fax:** +1-860-635-4962

e-mail: maysoon.hasan@nats-usa.com

   

*Innovative Solutions in Radiation Detection & Analysis*
*Your Single Stop for All Radiation Detection Solution*

**From:** Dan Edward <dedward@radshield.com>
**Sent:** Monday, November 25, 2019 12:18 PM
**To:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>
**Subject:** Re: NATS PO # 909103 for 1500 pcs/ Tech Flow

See below, see if you can get this done today.

**Dan Edward | Director of Sales & Business Development | RST Radiation Shield Technologies, Inc.**
**866 7 Demron (866-733-6766) ext 110 | Skype: DEdwardRST |** dedward@radshield.com
**Direct Line: 305.774.6075**
**Cell: 786.519.6167**
I find the harder I work the more luck I seem to have.-Thomas Jefferson



---

**From:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>
**Date:** Thursday, November 21, 2019 at 7:12 PM
**To:** Dan Edward <dedward@radshield.com>
**Subject:** RE: NATS PO # 909103 for 1500 pcs/ Tech Flow

Convince the CEO with 65% NET 30. And I will to convince the two parties to delete the penalty from our PO.

Yours Sincerely,

*Maysoon R. Hasan*

Area Manager

NATS, Incorporated

511 Centerpoint Drive

Middletown, CT 06457

U.S.A.

www.nats-usa.com

☎ **office:** +1-860-635-6820 Ext.111

**fax:** +1-860-635-4962

e-mail: maysoon.hasan@nats-usa.com

 

**Innovative Solutions in Radiation Detection & Analysis**
**Your Single Stop for All Radiation Detection Solution**

---

**From:** Dan Edward <dedward@radshield.com>
**Sent:** Thursday, November 21, 2019 4:39 PM
**To:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>
**Subject:** Re: NATS PO # 909103 for 1500 pcs/ Tech Flow

I told Dr Jazi at Tech Flow if he could make 35% deposit and 35% at time of shipping I would do everything I could to convince my CEO to allow the remaining 30% to be net 30.

First and most importantly this will take the 120 days from the date we receive the deposit. So even if somehow we do agree to a financial payment Tech Flow must get an extension. We won't be subject to a penalty because the lead time started before the distributor came to terms with the manufacturer. Someone really messed up there.


Dan Edward
Director of Sales and Business Development
866.733.6766 ext 110
Direct Line 305.774.6075
Cell 786.519.6167

---

**From:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>
**Sent:** Thursday, November 21, 2019 4:18:06 PM
**To:** Dan Edward <dedward@radshield.com>
**Subject:** RE: NATS PO # 909103 for 1500 pcs/ Tech Flow

Dear Dan,

Honestly, how much you need to secure the raw material for this order? If you do not want to answer, it is ok. it's your right.

I am just trying to find out how we can all done the job, without pressure.

It is a big order, who has this cash in front? Do not make it impossible. Leave a window.


Yours Sincerely,
*Maysoon R. Hasan*
Area Manager
NATS, Incorporated
511 Centerpoint Drive

6

Middletown, CT 06457
U.S.A.
www.nats-usa.com
☎ office: +1-860-635-6820 Ext.111
fax: +1-860-635-4962
e-mail: maysoon.hasan@nats-usa.com

 

*Innovative Solutions in Radiation Detection & Analysis*
*Your Single Stop for All Radiation Detection Solution*

---

**From:** Dan Edward <dedward@radshield.com>
**Sent:** Thursday, November 21, 2019 4:06 PM
**To:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>
**Subject:** Re: NATS PO # 909103 for 1500 pcs/ Tech Flow

Maysoon if it were up to me of course. Our board of directors and CEO met this am and the ONLY option made available was the 25% down and paid in full prior to shipping. Looking back my initial offer to Tech had such low margins that when they said the end user insisted on another 10% we agreed in hopes of the bigger 5000 suit orders to follow. Well with the trade wars between the US and China and tariffs our raw materials costs since the quote in January are up over 50%. It's not that we are even negotiating. I am being bluntly open that financially the terms being asked we would lose money slow other pending orders and risk relationships with very good current customers. Also there was a BIG lack of understanding on both sides that I know now could have been avoided and will be in the future.

Dan Edward
Director of Sales and Business Development
866.733.6766 ext 110
Direct Line 305.774.6075
Cell 786.519.6167

---

**From:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>
**Sent:** Thursday, November 21, 2019 3:40:30 PM
**To:** Dan Edward <dedward@radshield.com>; Naji Osman <naji@techflow.com.sa>
**Cc:** Syed R. Maswood <SMaswood@nats-usa.com>
**Subject:** RE: NATS PO # 909103 for 1500 pcs/ Tech Flow

Dear Dan,

What if I convinced my director and Tech flow with 35% down Payment? Can you agree for a balance of 65% by LC?

Yours Sincerely,
*Maysoon R. Hasan*
Area Manager
NATS, Incorporated
511 Centerpoint Drive
Middletown, CT 06457

U.S.A.
www.nats-usa.com
☎ office: +1-860-635-6820 Ext.111
fax: +1-860-635-4962
e-mail: maysoon.hasan@nats-usa.com




**Innovative Solutions in Radiation Detection & Analysis
Your Single Stop for All Radiation Detection Solution**

---

**From:** Dan Edward <dedward@radshield.com>
**Sent:** Thursday, November 21, 2019 2:53 PM
**To:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>; Naji Osman <naji@techflow.com.sa>
**Cc:** Syed R. Maswood <SMaswood@nats-usa.com>
**Subject:** Re: NATS PO # 909103 for 1500 pcs/ Tech Flow

Hi Maysoon,

I truly appreciate your effort but the only way RST can accept this order is with 25% down and 75% prior to shipping. I hope in the future these things are discussed and agreed upon by both parties and not unilaterally.

**Dan Edward | Director of Sales & Business Development | RST Radiation Shield Technologies, Inc.
866 7 Demron (866-733-6766) ext 110 | Skype: DEdwardRST | dedward@radshield.com**
**Direct Line: 305.774.6075**
**Cell: 786.519.6167**
I find the harder I work the more luck I seem to have.-Thomas Jefferson



Radiation Shield Technologies

---

**From:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>
**Date:** Thursday, November 21, 2019 at 2:40 PM
**To:** Dan Edward <dedward@radshield.com>, Naji Osman <naji@techflow.com.sa>
**Cc:** "S. Maswood" <SMaswood@nats-usa.com>
**Subject:** RE: NATS PO # 909103 for 1500 pcs/ Tech Flow

Dear Dan,

To make this work done smoothly, and other businesses in future, we need to work together for the best. If payment is the only obstacles, let us work in this way.

Each one gives an offer of what he can. Then all will work to find a solution in between.
Let us starts with 25% or 35% in front as soon as possible so you can start purchasing the raw material.

If anyone has another solution to start, please let me know,

Yours Sincerely,

*Maysoon R. Hasan*

Area Manager
NATS, Incorporated
511 Centerpoint Drive
Middletown, CT 06457
U.S.A.
www.nats-usa.com
☎ **office**: +1-860-635-6820 Ext.111
**fax**: +1-860-635-4962
e-mail: maysoon.hasan@nats-usa.com

 

*Innovative Solutions in Radiation Detection & Analysis*
*Your Single Stop for All Radiation Detection Solution*

---

**From:** Dan Edward <dedward@radshield.com>
**Sent:** Thursday, November 21, 2019 2:10 PM
**To:** Naji Osman <naji@techflow.com.sa>
**Cc:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>; Syed R. Maswood <SMaswood@nats-usa.com>
**Subject:** Re: NATS PO # 909103 for 1500 pcs/ Tech Flow

Naji,

Then the order cannot be processed. My quote to you included our payment terms. We have a bank ready today to allow 25% deposit from you and 75% from our distributor at the time of shipping. I'm not sure who's mistake it was making these payment arrangements without consulting RST. Also the lead time is 4 months from the time RST receives the deposit. Any penalties incurred before the agreed 120 days on the original quote would not be absorbed by RST. My CEO Dr. DeMeo has asked I forward you Naji and your GM Jazi the proposal we have to hopefully save the order. I will forward the email now and hopefully we can still make this happen.

**Dan Edward | Director of Sales & Business Development | RST Radiation Shield Technologies, Inc.**
**866 7 Demron (866-733-6766) ext 110 | Skype: DEdwardRST | dedward@radshield.com**
**Direct Line: 305.774.6075**
**Cell: 786.519.6167**
I find the harder I work the more luck I seem to have.-Thomas Jefferson

RST
Radiation Shield Technologies

---

**From:** Naji Osman <naji@techflow.com.sa>
**Date:** Thursday, November 21, 2019 at 1:25 PM
**To:** Dan Edward <dedward@radshield.com>
**Cc:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>, "S. Maswood" <SMaswood@nats-usa.com>
**Subject:** Re: NATS PO # 909103 for 1500 pcs/ Tech Flow

Dear Dan,

NATS already have our PO. It is not possible to go back to the LC choice now, LC process will take mor than one month from us to issue. Also our bank LC is not allowing advance payment and you will not got your money before one month at least after submitting shipping docs. So please do your best and help us all solving this issue.

Regards,

On Thu, 21 Nov 2019 at 1:16 PM Dan Edward <dedward@radshield.com> wrote:

Hi Maysoon,

That would be great news! It was made clear to me from my CEO and our directors again today that the balance must be paid in full prior to shipping. Our original invoice accepted by Tech Flow was with our standard payment terms of 50% down and 50% prior to shipping. I hope to hear from you maybe by 3pm, Ive got an appointment outside the office after that. If I have not heard back from you and I do need to consult with Jazi and Naji at Tech Flow regarding the contract offer on the table to accept the LC and make final payment prior to shipping I will be fully transparent and inform you I am doing so.

**Dan Edward | Director of Sales & Business Development | RST Radiation Shield Technologies, Inc.**
**866 7 Demron (866-733-6766) ext 110 | Skype: DEdwardRST | dedward@radshield.com**
**Direct Line: 305.774.6075**

**Cell: 786.519.6167**
I find the harder I work the more luck I seem to have.-Thomas Jefferson



**From:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>
**Date:** Thursday, November 21, 2019 at 12:11 PM

**To:** Dan Edward <dedward@radshield.com>
**Cc:** Naji Osman <naji@techflow.com.sa>, "S. Maswood" <SMaswood@nats-usa.com>
**Subject:** RE: NATS PO # 909103 for 1500 pcs/ Tech Flow

Dear Dan,

I will work to solve this problem by today.

Yours Sincerely,
*Maysoon R. Hasan*
Area Manager
NATS, Incorporated
511 Centerpoint Drive
Middletown, CT 06457
U.S.A.
www.nats-usa.com
☎ **office**: +1-860-635-6820 Ext.111
**fax:** +1-860-635-4962
e-mail: maysoon.hasan@nats-usa.com




*Innovative Solutions in Radiation Detection & Analysis*
*Your Single Stop for All Radiation Detection Solution*

---

**From:** Dan Edward <dedward@radshield.com>
**Sent:** Thursday, November 21, 2019 10:44 AM
**To:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>
**Cc:** Naji Al-Fanjery <naji@techflow.com.sa>; Syed R. Maswood <SMaswood@nats-usa.com>
**Subject:** Re: NATS PO # 909103 for 1500 pcs/ Tech Flow

Hi Maysoon,

It will all be worked out shortly. Exactly about the payment terms, no one has the authority to dictate RST's payment terms. I believe it was a miscommunication and the payment terms were not discussed with RST and things sort of spiraled down from there. RST has our payments terms which we provide to our distributors. Unfortunately RST is not in a position to ship $750,000 of product net 30. NATS is unable to make the payment necessary of $750,000 prior to shipping. We do not have time unfortunately to spend discussing payments terms of other companies except RST's as each day that passes is very costly. If you can provide RST a PO by this afternoon with our payment terms of 25% deposit and 75% prior to shipping we are excited to work with you on this. Tech Flow (Jazi and Naji) will receive a PO today accepting their LC AND with the payment terms RST requires so we can start tomorrow. Im actually walking into our meeting for 1030am right now. I'll be out in about an hour if you would like to call and discuss.

**Dan Edward | Director of Sales & Business Development | RST Radiation Shield Technologies, Inc.**
**866 7 Demron (866-733-6766) ext 110 | Skype: DEdwardRST | dedward@radshield.com**
**Direct Line: 305.774.6075**

**Cell:** 786.519.6167
I find the harder I work the more luck I seem to have.-Thomas Jefferson



---

**From:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>
**Date:** Thursday, November 21, 2019 at 10:15 AM
**To:** Dan Edward <dedward@radshield.com>
**Cc:** Naji Osman <naji@techflow.com.sa>, "S. Maswood" <SMaswood@nats-usa.com>
**Subject:** RE: NATS PO # 909103 for 1500 pcs/ Tech Flow

Dear Dan:

I do not understand. Who is the other company who got the same PO from Civil Defense in Saudi Arabia? I am confused I have no authority to discuss this PO payment terms.

All I can confirm is that we work with companies like Ametek , Ludlums who have very tight financial controls but who all give us Net 30 terms. This is the First time we faced this problem with US Vendor.
I hope we can solve this soon and process PO which we are holding.


Yours Sincerely,
*Maysoon R. Hasan*
Area Manager
NATS, Incorporated
511 Centerpoint Drive
Middletown, CT 06457
U.S.A.
www.nats-usa.com
☎ **office**: +1-860-635-6820 Ext.111
**fax:** +1-860-635-4962
e-mail: maysoon.hasan@nats-usa.com

        

*Innovative Solutions in Radiation Detection & Analysis*
*Your Single Stop for All Radiation Detection Solution*

---

**From:** Dan Edward <dedward@radshield.com>
**Sent:** Wednesday, November 20, 2019 7:01 PM
**To:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>
**Subject:** Re: NATS PO # 909103 for 1500 pcs/ Tech Flow

Hi Maysoon,

Thank you for the quote. Unfortunately RST cannot accept your payment terms and will use another company for this order. I do hope we continue to receive RFQ's and know we will be working together more and more in 2020.

I promise on less significant orders we will do our best to work with NATS on payment terms. Even if we received 75% deposit and were net 30 for 25% on this order we couldn't do it.

I hope to hear from you soon on the next one!


Dan Edward
Director of Sales and Business Development
866.733.6766 ext 110
Direct Line 305.774.6075
Cell 786.519.6167

---

**From:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>
**Sent:** Wednesday, November 20, 2019 2:15:17 PM
**To:** Dan Edward <dedward@radshield.com>; Syed R. Maswood <SMaswood@nats-usa.com>
**Cc:** Naji Al Fanjary (naji@healthphysics.com.sa) <naji@healthphysics.com.sa>
**Subject:** NATS PO # 909103 for 1500 pcs/ Tech Flow


Dear Dan,


Attached is NATS PO # SA-909103 regarding the 1500 suits for Tech Flow/Saudi Arabia


Look forward to receiving your invoice and the acknowledgment.


Yours Sincerely,

*Maysoon R. Hasan*

Area Manager

NATS, Incorporated

511 Centerpoint Drive

Middletown, CT 06457

U.S.A.

**www.nats-usa.9090103com**

☎ **office**: +1-860-635-6820 Ext.111

**fax**: +1-860-635-4962

e-mail: maysoon.hasan@nats-usa.com





*Innovative Solutions in Radiation Detection & Analysis*
*Your Single Stop for All Radiation Detection Solution*

---

**From:** Dan Edward <dedward@radshield.com>
**Sent:** Monday, November 18, 2019 11:49 AM
**To:** Maysoon Hasan <Maysoon.Hasan@nats-usa.com>; Syed R. Maswood <SMaswood@nats-usa.com>
**Subject:** Invoice for Tech Flow

Hi Maysoon,

Please find the attached invoice for the Tech Flow order. Please let me know if you have any questions.

**Dan Edward | Director of Sales & Business Development | RST Radiation Shield Technologies, Inc.**
**866 7 Demron (866-733-6766) ext 110 | Skype: DEdwardRST | dedward@radshield.com**
Direct Line: 305.774.6075

**Cell: 786.519.6167**
I find the harder I work the more luck I seem to have.-Thomas Jefferson



Radiation Shield Technologies

--
Naji Osman,CBRNe, NDT
| Executive & Sales Manager | Tech Flow Co. |

15

|P.O.Box 286947 Riyadh 11323| Kingdom of Saudi Arabia |
|Tel :( +966) 11 487 9944 | F: (+966) 11 4533411| M: (+966)507929977 |



**Radiation Shield Technologies**

## NON-EXCLUSIVE DISTRIBUTOR AGREEMENT

THIS NON-EXCLUSIVE DISTRIBUTOR AGREEMENT is entered into as of this 2nd day of December, 2019 (the "Effective Date") by and between RADIATION SHIELD TECHNOLOGIES, INC., a Delaware corporation ("Supplier"), and **NATS INCORPORATED** ("Distributor") with its headquarter offices at 511 Centerpoint Drive, Middletown, CT 06457.

### W I T N E S S E T H :

**Whereas**, Supplier and Distributor are parties to that certain Confidentiality Agreement dated December 2, 2019  (the "Confidentiality Agreement"); and

**Whereas**, subject to the terms and conditions set forth herein, Distributor desires to represent and sell certain radiation attenuation products for the medical and/or military protection markets from Supplier, and Supplier desires to sell such products directly to Distributor's customers, using the Trademarks "DEMRON™" and/or "RST™"

**In consideration of** the mutual promises, covenants, representations, warranties, and agreements contained in this Agreement and the mutual benefits to be derived there from, and in reliance upon the foregoing recitals of fact, the parties agree as follows:

**I.     DEFINITIONS**
When used in this Agreement, the following terms shall have the respective meanings indicated, such meanings to be applicable to both the singular and plural forms of the terms defined:

A.     *Accessories* means the accessories described in Schedule A attached hereto, and includes any special devices manufactured by Supplier and used in connection with the operation or use of the Goods.

B.     *Affiliate* means any company controlled by, controlling, or under common control with Supplier.

C.     *Agreement* means this Agreement and Schedule A, together with all written amendments made thereto.

D.     *Customer* means any person who purchased or leases Products from Distributor.

E.     *Delivery point* means Supplier's offices.

12/2/2019

T:  866.7DEMRON
866.733.6766

F: 866.5DEMRON
866.533.6766

P.O. Box 14-4254
Coral Gables, FL 33114

www.RadShield.com

F.     *Goods* means those Supplier units described in Schedule A.  Goods may be deleted from or added to Schedule A, and their specifications and design may be changed by Supplier at its sole discretion at any time by mailing written notice of such changes to Distributor.  Each change shall become effective thirty (30) days following the date notice thereof is sent to Distributor.

G.     *Products* means Goods, Accessories, and Spare Parts.

H.     *Spare Parts* means:
   (1)     all parts and components of the Goods;

   (2)     any special devices used in connection with the maintenance or servicing of the Goods.

I.     *Territory* means the geographic area or areas set forth in Schedule A.

J.     *Trademarks* means any trademark, logo, service mark or other commercial designation, whether or not registered, used to represent or describe the Products of Supplier, as set forth in Schedule A.

## II.     APPOINTMENT OF DISTRIBUTOR

A.     APPOINTMENT.  Supplier hereby appoints Distributor as a non-exclusive distributor to represent, promote, market, provide customer support, and sell Products in the Territory, and Distributor accepts that position.

B.     RELATIONSHIP OF PARTIES.
   (1)     Distributor is an independent contractor and is not the legal representative nor agent of Supplier for any purpose and shall have no right nor authority (except as expressly provided in this Agreement) to incur, assume, or create in writing or otherwise, any warranty or control over any of Supplier's employee's, all of whom are entirely under the control of Suppler, who shall be responsible for their acts and omissions.  Distributor shall, at its own expense, during the Term of this Agreement and any extension thereof, maintain full insurance required under any laws of the Territory covering all persons employed by and working for it in connection with the performance of this Agreement, and upon request shall furnish Supplier with satisfactory evidence of the maintenance of such insurance.  Distributor accepts exclusive liability for all contributions and payroll taxes required under any laws of any applicable jurisdiction as to all persons employed by and working for it.

   (2)     Distributor acknowledges and agrees that during the term of this Agreement, Supplier may, and shall have the right to: (a) unilaterally and independently sell, market, advertise, and promote the Products within the Territory, directly and/or by means of electronic commerce; and (b) perform current agreements and enter into new and additional agreements with other distributors or third party resellers and/or sales representatives to sell, market, promote, and/or advertise the Products within the Territory.  Distributor acknowledges and agrees that the sale and/or promotion of the Products in the Territory, including without limitation by Supplier and/or third parties or distributors is expressly contemplated and permitted under the terms of this Agreement and shall not be deemed to modify the Distributor's rights or obligations hereunder.

2

(3)    Nothing contained in this Agreement shall be deemed to create any partnership or joint venture relationship between the parties.

(4)    Nothing contained herein, express or implied, is intended to confer upon any person, other than the parties hereto and their permitted successors and assigns, any rights or remedies under or by reason of this Agreement.

(5)    Nothing in this Agreement shall confer upon Distributor the right to manufacture, research and develop, or redesign any Products.

(6)    Should the parties wish to extend the nature of their relationship into manufacturing, research and development, or design, they shall do so in a separate written agreement. Such agreement shall not in any way affect the rights conferred and obligations due pursuant to this Agreement.

(7)    Any modifications or improvements made to Products by Distributor must be done only with Supplier's written consent. Absent a separate written agreement, ownership and rights to such modifications or improvements shall be wholly and unconditionally assigned to Supplier.

C.    SALE OF PRODUCTS BY DISTRIBUTOR. Distributor shall use its best efforts to distribute the Product and fully to develop the market therefore within the Territory. The parties have consulted together and now agree that if Distributor's best efforts are used as provided in this Section, a minimum of (twenty-five thousand) (25,000) Products ("Annual Market Potential") will be purchased and distributed in the Territory during the first year of this Agreement, fifty-thousand (50,000) Products during the second year, and one hundred thousand (100,000) Products during the third year and subsequent years.

D.    COMPETING PRODUCTS. During the term of this agreement and for a period of two (2) years following the termination of this agreement, Distributor or any of its officers, partners, employees, or shareholders, regardless of corporate name, shall not:

(1)    Represent, manufacture, or distribute any products that are competitive with Products;

(2)    Represent, manufacture, or distribute any products that Supplier deems competitive with Products;

(3)    Represent or distribute non-competitive products of a manufacturer who is a competitor of Supplier, if reasonably requested to do so by Supplier;

(4)    Solicit orders for Products sold under or bearing any of the Trademarks from outside the Territory unless authorized in writing to do so by Supplier; or

(5)    Hire or solicit any current or former Supplier employee or representative.

2/2/2019

3

E.    ADVERTISING.
    (1)    Distributor shall, during the Term of this Agreement and any extension thereof, advertise and hold itself out as an authorized Distributor of the Products.

    (2)    At all times during the term of the distributorship created by this Agreement and any extension thereof, Distributor shall use the Trademarks in all advertisements and other activities conducted by Distributor to promote sale of the Products.

    (3)    The contents of any advertising shall not contain or imply any information, product specifications, representations or warranties different from those contained in English-language written materials provided by Supplier.

    (4)    The Products will at all times be designated by their correct names and identified as the products of Supplier being offered for sale by Distributor as an independent distributor for Supplier.

    (5)    Distributor shall submit examples of all proposed advertisements and other promotional materials for the products to Supplier for inspection, and Distributor shall not use any such advertisements or promotional materials without having received the prior consent of Supplier to do so.

    (6)    Distributor shall not, pursuant to this Agreement or otherwise, have or acquire any right, title, nor interest in or to Supplier's Trademarks.  All use of the Trademarks by Distributor is subject to the prior express written approval of Supplier, which shall not be unreasonably withheld or delayed.

    (7)    Distributor shall not contract with General Services Administration (GSA) without Supplier's written consent.

    (8)    Distributor shall not privately label Supplier Products, and Distributor shall not call Supplier Products by any other names than those approved by Supplier.

    (9)    Distributor shall promote Supplier's interests in any trade, industry, professional, or related organization of which Distributor is now or becomes a member.

F.    NEW PRODUCTS.
    (1)    Supplier shall have the right, without notice and in its sole discretion, to modify the Products, including without limitation, as to specifications, styles, colors, materials, design, patterns, lines, width and type, and shall be under no obligation to manufacture, sell or supply any particular Product or to continue, discontinue, or change any Product.

12/2/____

(2)     If Supplier or any Affiliate now or hereafter manufactures or distributes, or proposes to manufacture or distribute, any product other than the Products, Supplier shall immediately notify, or case such Affiliate to notify, Distributor of that fact and of all details concerning that product.  Distributor may request from Supplier distribution rights for that product in the Territory, or any portion thereof, and if so requested, Supplier shall grant, or shall cause the subject Affiliate to grant, such distribution rights to Distributor on terms and conditions no less favorable than those provided in this Agreement with respect to Products.

G.     DISTRIBUTOR SALES, SERVICE AND STORAGE FACILITIES.

(1)     Distributor shall, at its own expense, engage and maintain a sales, service and parts handling organization in the Territory, staffed with such experienced personnel as are necessary to enable Distributor to perform its obligations under this Agreement.

(2)     Distributor shall, at its expense, maintain facilities and personnel in the Territory that will enable it promptly and satisfactorily to perform, at a reasonable price, all inspection, maintenance and other necessary servicing of Products sold by Distributor. To assist Distributor in the discharge of this service and maintenance function, Supplier shall provide service and maintenance training, without charge, to any reasonable number of Distributor's personnel as Distributor shall designate.

(3)     Distributor shall, at its expense, at all times store and maintain its inventory of Products in accordance with current, applicable instructions issued by Supplier from time to time.

(4)     Supplier shall provide Distributor, at its own expense, a master copy of Supplier's current, applicable operation and maintenance manual which Distributor can reproduce and provide to each Customer at the time of sale and, at that time, Distributor shall, at its expense, fully explain and demonstrate to the Customer the proper method of operating and maintaining the Products.

(5)     Distributor shall mail, fax or e-mail to Supplier, during the term of the distributorship created by this Agreement and any extension thereof, prompt written notice of the address of each location at which products are stored, and the address of each facility established by Distributor to sell and service the Products. Supplier may, through its designated agent, inspect all such locations and facilities and the operations conducted therein at any time during normal business hours.

(6)     Distributor shall, at its own expense, comply with all laws and regulations of all jurisdictions that pertain or may pertain to the sale or distribution of the Products purchased hereunder.

(7)     Distributor shall provide customer service in the Territory, all such service to be of a quality and availability consistent with the sale and promotion of high quality products.

(8)     Distributor shall provide to Supplier, at Supplier's request, the annual audited financial statement of Distributor, distributor's tax declarations, and  such information relating to Distributor's express representations with respect to its promotional activities as Supplier may request.

12/2/2018

5

(9)    Distributor shall immediately inform Supplier in writing of any changes with respect to Distributor's business, Distributor's financial condition, the market for the Products in the Territory, or the economy in the Territory in any year of the term of this Agreement.

(10)    Distributor shall provide basic logistical support for Supplier personnel during any visits to the Territory that relate to Distributor's sale of the Products.

(11)    Distributor shall notify Supplier immediately if it becomes aware of any infringement of Supplier Trademarks and/or patents.

(12)    Distributor shall bear its own costs and expenses incurred in performing its obligations hereunder.

H.    TRAINING OF DISTRIBUTOR.
    (1)    As promptly as practicable after execution of this Agreement, Supplier shall transmit to Distributor information, materials, manuals and other technical documents necessary to enable Distributor to perform its obligations under this Agreement and, in particular, to carry out the warranty repairs pursuant to this Agreement. Throughout the Term of this Agreement and any extension thereof, Supplier shall continue to give Distributor such technical assistance as Distributor may reasonably request. Distributor shall reimburse Supplier for all reasonable out-of-pocket expenses incurred by Supplier in providing technical assistance.

    (2)    All samples, materials, and documents that are provided to Distributor by Supplier shall remain the property of Supplier.  At Distributor's expense, Distributor agrees to secure all samples, materials, and documents at all times and immediately return any and all materials back to Supplier upon request.  All products purchased by Distributor, and marketing materials produced by Distributor shall be the property of Distributor.

I.    DISTRIBUTOR REPORTS.
    (1)    Distributor shall exercise due diligence to keep Supplier promptly informed with regard to:

        (a)    Distributor's marketing and promotional activities and sales forecasts;

        (b)    Market conditions, business trends, problem areas, and competition within the Territory;

        (c)    The laws and regulations that are to apply in the Territory to which the Products must conform, including, but not limited to, building codes, labeling, technical specifications, and safety requirements;
        (d)    The laws and regulations concerning the business of Distributor insofar as relevant to Supplier; and

        (e)    Any observations or complaints received from customers with respect to the Products.

12/2/20A

6

(2)    At least ninety (90) days prior to each anniversary date of this Agreement, Distributor shall provide sales projections and marketing plans for the following year, including, without limitation, an advertising and promotional budget setting forth the Distributor's proposed advertising and promotional activities and the corresponding cost and the timing thereof.

J.    SPARE PARTS AND ACCESSORIES. Distributor shall keep in stock an adequate supply of Spare Parts and Accessories for the servicing of Goods.  No Spare Parts or Accessories not manufactured by Supplier shall be used in connection with the Goods unless Supplier has approved them in writing.

K.    CONFIDENTIAL INFORMATION. Written technical data, drawings, plans and engineering in technical instructions pertaining to the Products are recognized by Distributor to be secret and confidential and to be the property of Supplier. Those items, other than material that is otherwise in the public domain, shall at all times and for all purposes be held by Distributor in a confidential capacity and shall not, without the prior written consent of Supplier, (i) be disclosed by Distributor to any person, firm or corporation, excepting those salaried employees of Distributor who are required to utilize such items in connection with the sale, inspection, repair or servicing of Products during the term of the distributorship created by this Agreement or any extension thereof, or (ii) be disclosed to any person, firm or corporation, or copied or used by Distributor, its employees or agents at any time following the expiration or termination of the distributorship created by this Agreement or any extension thereof, except where such use is necessary in order to maintain or service Products still covered by the warranty provisions of this Agreement at the time of such expiration or termination. Supplier may require as a condition to any disclosure by Distributor pursuant to this paragraph that any salaried employee to whom disclosure is to be made sign an individual secrecy agreement, enforceable by Supplier, containing terms satisfactory to Supplier.

## III.    TERMS OF PURCHASE AND SALE OF PRODUCTS

A.    PURCHASE OF PRODUCT.

(1)    Distributor shall purchase all of the Products directly from Supplier and not through third parties. Such requirements shall include (i) purchasing and maintaining an inventory of Products that is sufficient to enable Distributor to perform its obligations hereunder, and (ii) at least one (1) demonstration model of the Goods and Accessories which shall count toward Distributor's minimum purchase requirement.

(2)    Each order for Products submitted by Distributor to Supplier shall be subject to the written acceptance of Supplier, and Supplier may, in its own discretion, accept or reject any order for Products without obligation or liability to Distributor by reason of its rejection of any such request.

B.    PURCHASE FOR RESALE. All Products purchased by Distributor shall be purchased solely for commercial resale or lease, excepting those Products reasonably required by Distributor for advertising and demonstration purposes.

12/2/2019

C.     ORDER PROCEDURE.

(1)     Each order for Products issued by Distributor to Supplier under this Agreement shall be submitted in writing on the form of purchase order (the "Purchase Order Form")(Exhibit A) and shall further set forth the delivery date or dates and the description and quantity of Products which are to be delivered on each of such dates, or, if given verbally, shall be confirmed by Distributor in writing on a Purchase Order Form submitted within two (2) business days after the verbal order is submitted, in which case the terms contained within the Purchase Order Form shall control.  An order for Products shall not provide a delivery date less than ninety (90) days after the date that order is delivered to Supplier.  Supplier shall assign a point person at Supplier to manage the relationship with Distributor.

(2)     The individual contracts for the sale of Products formed by Distributor's submission of orders to Supplier pursuant to the terms and conditions hereof shall automatically incorporate, to the extent applicable, the terms and conditions hereof, shall be subject only to those terms and conditions (together with all terms in orders which are contemplated by this Agreement) and shall not be subject to any conflicting or additional terms included in any documents exchanged in connection therewith. Notwithstanding anything in this Section, Supplier and Distributor may, by written agreement, modify the terms and conditions of this Agreement.

(3)     Once Distributor obtains a purchase order from Distributor's customer, the purchase order will be made payable to Supplier and the accounts receivable and customer contact information shall be the property of Supplier.

(4)     Distributor agrees and hereby acknowledges that it is solely responsible for obtaining the appropriate documents and export licenses for all end customers.  Should Distributor fail to obtain proper documents and export licenses, they shall still remain liable to Supplier for payment for all Purchase Orders submitted and not withdrawn within the window provided in subsection III. D. below.

(5)     Provided that Distributor is able to obtain and show proof of proper export licenses for the final intended destination of Products, Supplier shall promptly, but no later than one hundred twenty (120) days after payment is received and export licenses are obtained, whichever is later, fill the orders submitted by Distributor.

(6)     In the event of any inability by Supplier to fill all or any portion of Distributor's order within the period prescribed, Supplier shall notify Distributor what portion of the order that Supplier can fill, and when the remaining portion of such order will be filled.

(7)     In the event the terms of the Purchase Order Form and the terms of this Agreement conflict, the terms of this Agreement shall prevail and control.

12/2/2018

8

(8)     Distributor shall be responsible for the following additional charges, if any, applicable to the Products ordered: (i) all federal, state, territorial, or municipal taxes or fees paid or payable by Supplier on, or measured by, the amount of Products sold and delivered to Distributor, (ii) all charges for freight in respect of Products delivered to Distributor, including the cost of transportation, insurance, and handling, and (iii) any customs duties, import or export tariffs, or other costs associated with international shipping (the price for the Products, together with the additional charges, if any, are hereinafter collectively referred to as the "Product Price").

(9)     In the event of any Supplier adjustments to the Product Price, Distributor shall notify Supplier in writing within thirty (30) days after delivery of the Products of the amount of all costs and charges relating to such adjustment and shall within fifteen (15) days after any reasonable request therefore by Supplier furnish Supplier with reasonable documentation of any and all such costs and charges.

(10)     Distributor shall bear and pay all costs and expenses in connection with the return or other disposition of Products, including but not limited to any storage, handling, freight, insurance, and other similar costs and expenses.

D.     CANCELLATION OF ORDERS. All cancellation of orders by Distributor shall be in writing, or if not initially in writing, shall be confirmed in writing. If Distributor cancels an order that has been accepted by Supplier, Distributor shall reimburse Supplier for any cost incident to such order incurred by Supplier prior to the time it was informed of the cancellation. In any case, cancellation must be no later than fifteen (15) days of submitting the Purchase Order. No cancellation will be permitted once an order has been shipped.

E.     PURCHASE PRICE. The prices for Goods, Accessories, and Spare Parts have been provided. All prices are F.O.B. Shipping Point. If the price for any Product is not set forth and Distributor nevertheless orders such a Product from Supplier, the parties hereby evidence their intention thereby to conclude a contract for the sale of that Product at a reasonable price to be determined by the Parties mutually negotiating in good faith. Supplier and Distributor will negotiate any volume discounting on a case-by-case basis. Any discounting of the manufacturer's suggested retail price must be approved in writing by Supplier, or else Distributor will have its margin reduced by that discounted amount. Distributor cannot sell nor advertise the Products below Manufacturer's Suggested Retail Price without the written consent of Supplier.

F.     PRICE CHANGES. Supplier reserves the right, in its sole discretion, to change prices or discounts applicable to the Products. Supplier shall give written notice to Distributor of any price change at least sixty (60) days prior to the effective date thereof. The price in effect as of the date of Distributor's receipt of notice of such price change shall remain applicable to all orders received by Supplier prior to that effective date.

G.     PACKING. Supplier shall pack all Products in accordance with Supplier's standard packing procedure, which shall be suitable to permit shipment of the Products to the Territory. Distributor will bear all shipping and handling costs.             12/2/20

9

H.    DELIVERY: TITLE AND RISK OF LOSS. All deliveries of Products sold by Supplier to Distributor pursuant to this Agreement shall be made F.O.B. Shipping Point, and title to and risk of loss of Products shall pass from Supplier to Distributor at the Shipping Point. Distributor shall be responsible for arranging all transportation of Products, but if requested by Distributor, Supplier shall, at Distributor's expense, assist Distributor in making such arrangements. Distributor shall also procure insurance for the transportation of the Products, and such insurance shall be of a kind and on terms current at the port of shipment. In the event that Supplier is requested to assist Distributor in arranging for transportation, Distributor shall reimburse Supplier for all costs applicable to the Products following their delivery to Distributor, including, without limitation, insurance, transportation, loading and unloading, handling and storage. Distributor shall pay all charges, including customs duty and sales tax, incurred with respect to the Products following their delivery to the carrier or forwarder.

I.    INSURANCE. At Distributor's sole expense, Distributor shall maintain Comprehensive General Liability or equivalent insurance coverage specifying this Agreement, including Premises and Operations, Broad Form Contractual Liability, Personal Injury Liability, Products and Completed Operations Liability or the equivalent, with coverage in commercially reasonable amounts in the aggregate of three million dollars ($3,000,000) and one million dollars ($1,000,000) per occurrence, per year, written by insurers of recognized responsibility. Within thirty (30) days of the Effective Date, at any time Distributor changes its insurer, and otherwise upon request, Distributor shall provide to Supplier a Certificate of Insurance evidencing such coverage. Distributor shall not terminate such coverage without thirty (30) days prior written notice to Supplier.

J.    INSPECTION AND ACCEPTANCE. Promptly upon the receipt of a shipment of Products, Distributor shall examine the shipment to determine whether any item or items included in the shipment are in short supply, defective or damaged. Within five (5) calendar days of receipt of the shipment, Distributor shall notify Supplier in writing of any shortages, defects or damage that Distributor claims existed at the time of delivery. Within thirty (30) days after the receipt of such notice, Supplier will investigate the claim of shortages, defects or damage, inform Distributor of its findings, and deliver to Distributor Products to replace any which Supplier determines, in its sole discretion, were in short supply, defective or damaged at the time of shipment. Unless notice is given as provided in this Section, Distributor shall be deemed to have accepted such Products and to have waived all claims for shortages, defect or damage.

K.    PAYMENT. Payment terms are as follows: fifty percent (50%) due upon the placement of any order and fifty percent (50%) due by wire transfer upon receipt and acceptance of the order by Distributor. Payment shall be made in United States dollars to a bank account to be notified in writing by Supplier to Distributor.

12/2/2019

L.    **U.S. EXPORT CONTROL.** *DISTRIBUTOR SHALL COMPLY WITH ALL UNITED STATES EXPORT LAWS AND SHALL OBTAIN EXPORT LICENSES AND ANY OTHER REQUIRED DOCUMENTATION AS REQUIRED BY LAW FOR ALL DESIGNATED END USERS.  SUPPLIER'S OBLIGATIONS TO SELL AND DELIVER PRODUCTS SHALL BE SUBJECT TO SUCH UNITED STATES LAWS AND REGULATIONS AS SHALL, FROM TIME TO TIME, GOVERN THE SALE AND DELIVERY OF GOODS FOR EXPORT FROM THE UNITED STATES.  SHOULD DISTRIBUTOR BE UNABLE TO OBTAIN APPLICABLE EXPORT LICENSES FOR ANY PARTICULAR ORDER, SUPPLIER SHALL BE RELIEVED OF ITS OBLIGATION TO DELIVER PRODUCTS, BUT DISTRIBUTOR SHALL NOT BE RELIEVED OF ITS OBLIGATION TO PAY FOR SUCH ORDERS.  DISTRIBUTOR SHALL NOT REEXPORT PRODUCTS OR DELIVER THEM TO ANY END USER OTHER THAN THEIR ORIGINALLY INTENDED CUSTOMERS FOR WHOM ALL EXPORT LICENSES AND DOCUMENTATION HAVE BEEN SECURED.*

## IV.    WARRANTIES

A.    SUPPLIER WARRANTY.

(1)    Supplier warrants that all new Products sold or furnished pursuant to this Agreement by Supplier to Distributor will be free under normal use and service from any defects in workmanship or materials, provided that any allegedly defective Product has not been altered, misused, neglected or damaged through causes unconnected with its manufacture.

(2)    The warranty described in this subsection shall terminate as to each Product upon the expiration of twelve (12) months from the date of delivery by Distributor to the initial user thereof, or within two (2) years from the date of original shipment by Supplier, whichever period ends first.

(3)    Due to the hazardous nature of the use of Products, this warranty will become void once Customer has used Products.

(4)    Supplier may change the foregoing warranty at any time with respect to orders for Products placed by Distributor but not yet accepted by Supplier on the effective date of a change in the warranty. Each change shall become effective sixty (60) days following the date on which notice thereof is given to Distributor.

12/2/2019

11

B.    REPAIR OF DEFECTIVE PRODUCTS.

(1)    Distributor shall, on behalf of Supplier, repair or replace all Products sold by Distributor that are or become defective within the terms of the warranty set forth herein. Supplier shall, free of charge, replace Products withdrawn by Distributor from its inventory to replace Products which are defective within the terms of the above warranty or, at Supplier's option, reimburse Distributor for the purchase price paid by Distributor for such Products and Accessories, provided the requirements of this section have been satisfied. In addition, Supplier shall reimburse Distributor for the cost incurred by Distributor to provide all necessary labor to repair or replace Products which are defective within the terms of the above warranty if Distributor has obtained Supplier's written agreement to pay such costs prior to the performance of any labor. Distributor shall not make any modification or change in the Products without obtaining the prior written consent of Supplier. All work and services performed by Distributor pursuant to the foregoing provisions shall be performed only in accordance with current, applicable Supplier operation and maintenance manuals and other written instructions issued by Supplier from time to time. Supplier shall not be responsible for reimbursing Distributor for any costs of transportation of Distributor's personnel incurred in connection with the performance of warranty work described above or for costs incurred by Distributor to ship replacement Products to Distributor's Customers. The remedy provided in this Section is the sole and exclusive remedy available to Distributor for breach of any of the warranty provisions set forth herein.

(2)    Supplier shall have no obligation to Distributor pursuant to this section unless Distributor shall have: (i) mailed to Supplier a written report containing evidence satisfactory to Supplier of the warranty defect, and describing in detail the warranty repairs or replacements which Distributor proposes to perform; (ii) established to the reasonable satisfaction of Supplier that the Distributor used its best efforts to inspect the defective Products to determine whether they met the warranty requirements.

(3)    Supplier shall have sole responsibility and discretion to determine, based on Distributor's report and any accompanying evidence, whether or not Product is defective so as to trigger the application of this warranty.

(4)    Distributor may not under any circumstance whatsoever issue a recall for any Product.  Supplier shall have the sole power and discretion to issue Product recalls.

C.    DISTRIBUTOR WARRANTIES.  As a condition precedent to the obligations of Supplier under this Agreement, Distributor makes the following covenants, representations, and warranties which shall be true and correct as of the date hereof and which shall survive the execution, expiration, termination and/or cancellation of this Agreement:

(1)    As of the Effective Date, Distributor declares that it represents and/or distributes or manufactures, directly or indirectly, only the products made by the manufacturers.

12/2/2019

12

(2)    Distributor has the power and authority to transact the business in the Territory of this Agreement.  Distributor has the right, power, legal capacity and authority to enter into this Agreement and the instruments referenced herein, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.  No governmental or other approvals or consents of any persons other than Distributor are required in connection with this Agreement.

(3)    The execution by Distributor of this Agreement and the consummation of the transactions contemplated hereby do not and will not result in or constitute any default or event that, with notice or lapse of time, or both, would be a default, breach or violation of the organizational instruments or laws governing Distributor or of any agreement or instrument to which Distributor is now a party and do not and will not violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination or award presently in effect having applicability to Distributor, any provision of any law, rule, or regulation with respect to the types of transactions contemplated by this Agreement.  This Agreement and any other documents or agreements executed and/or to be executed by Distributor pursuant to the terms of this Agreement constitute legal, valid and binding obligations of Distributor, enforceable in accordance with their respective terms.

(4)    All information furnished by Distributor in this Agreement and otherwise furnished or to be furnished by Distributor pursuant to this Agreement, is and shall be true, correct, complete, not misleading, and does not fail to state any fact without which the information provided by Distributor would be misleading.  If Distributor becomes aware of any fact or circumstance that would make any representation or warranty made herein by Distributor false, misleading, inaccurate or incomplete, or without which any such representation or warranty would be misleading, Distributor shall immediately inform Supplier in writing of such fact or circumstance.

**D.    DISCLAIMER OF WARRANTIES.** *EXCEPT AS EXPRESSLY WARRANTED IN THIS AGREEMENT, SUPPLIER HEREBY DISCLAIMS ALL WARRANTIES, EXPRESS, STATUTORY AND IMPLIED, APPLICABLE TO PRODUCTS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTY THAT ANY PRODUCT IS DELIVERED FREE OF CLAIMS OF THIRD PARTIES BY WAY OF INFRINGEMENT OR THE LIKE. SUPPLIER FURTHER DISCLAIMS ALL EXPRESS, STATUTORY AND IMPLIED WARRANTIES APPLICABLE TO PRODUCTS AND ACCESSORIES WHICH ARE NOT MANUFACTURED BY SUPPLIER. THE ONLY WARRANTIES APPLICABLE TO PRODUCTS NOT MANUFACTURED BY SUPPLIER SHALL BE THE WARRANTIES, IF ANY, OF THE MANUFACTURER OF THOSE ITEMS.*

12/2/2019

13

## V.    LIABILITY AND INDEMNITY

A.    LIABILITY. The total liability of Supplier for any loss, damage or claim, whether in contract, tort (including Supplier's active or passive negligence or strict liability) or otherwise, arising out of, connected with, or resulting from this Agreement or the performance or breach of any purchase order or contract of sale accepted or executed by Supplier pursuant to this Agreement, or from the design, manufacture, sale, delivery, resale, inspection, assembly, testing, repair, replacement, operation, maintenance or use of any Product or from the performance of any service shall not, in any event, exceed the wholesale price allocable to the product or service which gives rise to the claim, loss or damage. In no event, whether as a result of breach of contract or warranty or alleged negligence or strict liability, shall Supplier be liable for special, consequential, or punitive damages, including, without limitation, loss of profits or revenue, loss of Products or any associated equipment, cost of capital, cost of substituted equipment or parts, facilities or services, down-time costs, labor costs, or claims of Customers or Distributor.

B.    INDEMNITY.

(1)    Distributor agrees to indemnify, defend and hold Supplier, its agents and employees, harmless from and against all expense (including attorneys' fees), loss, liability and claims for damage to property (including that of Supplier or Distributor) or for injury to or death of any person (including each party's employees) actually or allegedly resulting directly or indirectly from anything occurring from any cause (including Supplier's active or passive negligence or strict liability) relating to the maintenance or operation of Distributor's premises, anything located thereon or to any other of Distributor's business activities.

(2)    Distributor agrees to indemnify, defend and hold Supplier, its agents and employees, harmless from and against all expense (including attorneys' fees), loss, liability and claims for damage to property (including that of Supplier or Distributor) or for injury to or death of any person (including each party's employees) actually or allegedly resulting directly or indirectly from anything occurring from any cause (including Supplier's active or passive negligence or strict liability) relating to the maintenance or operation of the business activities or premises of Customer as to the Products or anything located on said Customer's premises.

(3)    Distributor agrees to indemnify and hold the other harmless from and against any and all claims, damages and liabilities asserted by any person or entity resulting directly from any breach by it, or by any of its employees or agents, of this Agreement or any of its warranties, restrictions, representations, covenants, or obligations as provided for in this Agreement or from any negligent act, affirmative act, or omission to act by it, or any of its employees or agents. Such indemnification shall include all of Supplier's expenses (including attorneys' fees and costs), loss, liability and claims for damage to property (including that of Supplier, Distributor, or any Third Party) or for injury to or death of any person.

12/2/2014

14

(4)    Supplier shall promptly advise Distributor of any suit, claim or proceeding for which indemnification is to be sought and shall cooperate with Distributor in the defense or settlement thereof. Distributor shall select, retain and pay counsel in connection with such suit, claim or proceeding, subject to Supplier's consent, which shall not be unreasonably withheld. Distributor shall make no settlement without Supplier's prior written consent, which consent shall not be unreasonably withheld.

## VI.    TERM AND TERMINATION

A.    TERM. The distributorship created by this Agreement shall be effective for an initial term of two (2) years from the Effective Date and shall automatically renew for successive periods of one (1) year thereafter; provided, however, that either party may terminate the distributorship created by this Agreement at any time following its initial term, without cause, by mailing written notice of such termination to the other party not less than thirty (30) days prior to the effective date of such termination. Should either party so terminate this Agreement on such thirty (30) days notice after the initial term, the parties will negotiate in good faith appropriate compensation for the terminated party

B.    TERMINATION. This Agreement shall only be terminated for cause as set forth herein:

(1)    Either party may terminate this Agreement, effective upon the delivery of written notice of such termination to the other party, if: (i) the other party becomes insolvent, is generally not paying its debts as such debts become due, makes an assignment for the benefit of creditors, is the subject of any voluntary or involuntary case commenced under the federal bankruptcy laws, as now constituted or hereafter amended (which, in the case of involuntary bankruptcy, is not dismissed within thirty (30) days), or of any other proceeding under other applicable laws of any jurisdiction regarding bankruptcy, insolvency, reorganization, adjustment of debt or other forms of relief for debtors, has a receiver, trustee, liquidator, assignee, custodian or similar official appointed for it or for any substantial part of its property, or is the subject of any dissolution or liquidation proceeding; or (ii) there is a continued and material breach by the other party of any of the terms and conditions of this Agreement, provided that the party not at fault has given the other party thirty (30) days prior written notice of such breach, such other party has not remedied the breach and it is possible for the defaulting party to take such remedial action.

(2)    Without limiting any other rights or remedies which might be available to Supplier, each of the following events shall constitute an event of default and just cause for termination, after the occurrence of which Supplier shall have the right, at its option, to terminate this Agreement, which right Distributor hereby acknowledges:

(a)    Distributor has not purchased at least twenty-five thousand (25,000) Products during the first year of this Agreement, fifty thousand (50) Products during the second year, and one hundred thousand (100,000) Products during the third year.

12/2/2019

15

(b)    The breach by Distributor of an obligation hereunder, including without limitation its representations and warranties contained herein;

(c)    The breach by Distributor of any of the duties and obligations set forth in this Agreement and/or the restrictive covenants in the Confidentiality Agreement, which Distributor expressly acknowledges and agrees without limitation are essential obligations of Distributor hereunder, any of which, if breached, would give rise to a breach of this Agreement;

(d)    The misrepresentation or omission of any fact or circumstance in any document or information furnished, or required to be furnished, by Distributor to Supplier;

(e)    The failure to provide any information requested about Distributor's Customers or required to be furnished by Distributor to Supplier pursuant to this Agreement;

(f)    Any act or omission by Distributor that adversely and substantially affects the interests of Supplier in promoting and marketing the Trademark and/or the Products;

(g)    Distributor's failure to comply with the non-compete provision in section II. D.; or

(h)    Any facts or circumstances constituting just cause for termination under applicable law.

(4)    The failure of either party to terminate the distributorship created by this Agreement or any extension thereof upon the occurrence of any event described in this Section shall not constitute a waiver of such party's right to terminate the distributorship created by this Agreement nor any extension thereof upon any subsequent occurrence of any of those events.

C.    EFFECT OF TERMINATION.

(1)    Prior to the effective termination of this Agreement, all of the terms and conditions of, and the respective rights and obligations of the parties to, this Agreement will remain completely valid and enforceable. These include, without limitation, Distributor's right to order Products from Supplier and to have those orders accepted up to such effective date of termination, even though Supplier's actions taken with respect to such orders may take place after termination.

(2)    Upon the expiration or termination of the distributorship created by this Agreement or any extension thereof for any reason, Distributor shall promptly: (i) return to Supplier, at Distributor's expense, all advertising and promotional materials, sales aids, written technical materials, engineering, maintenance and operation manuals, drawings, plans, specifications and all other documents supplied by Supplier which are not required in the servicing of the Products purchased by Distributor prior to the termination or expiration date; and (ii) desist from advertising and holding itself out as an authorized Distributor of the Products

16

(3)    Except in accordance with the terms of this Agreement, Supplier, or any Affiliate, may undertake activities, direct or indirect, relating to the promotion, sales, or servicing of Products in the Territory only after the effective date of expiration or termination of the Distributorship created by this Agreement or any extension thereof.

(4)    Following the expiration or termination of the distributorship created by this Agreement or any extension thereof, Supplier and Distributor shall perform all contracts for sale of Products executed between them prior to such expiration or termination.

(5)    In the event of termination of this Agreement or any extension thereof, Supplier will continue to make available to Distributor, in accordance with all of the terms hereof, Spare Parts for all Goods sold pursuant to this Agreement, for a period of one (1) year from the effective date of such termination.

(6)    Notwithstanding anything to the contrary in this Agreement, no expiration or termination of this Agreement by either party shall affect any rights or obligations of either party (i) which are vested pursuant to this Agreement as of the effective date of such expiration or termination, or (ii) which are pursuant to Section 4 of this Agreement (with respect to Products still under warranty), or (iii) any other provisions intended by the parties to survive such expiration or termination.

(7)    To the extent permitted under applicable law, Supplier shall not be liable to Distributor for any loss, recoupment or damage, whether actual, indirect, incidental, consequential, special, punitive or otherwise, on any contract, warranty, tort, negligence, strict liability, antitrust, or any other legal basis, for or related to any termination of this Agreement. Distributor shall not be entitled to an indemnity for lost profit, goodwill or similar compensation in the event of termination of this Agreement for any reason. In the event that, notwithstanding the foregoing, Distributor is entitled to an indemnity for lost profit, goodwill or similar compensation under applicable law, Supplier's liability for any such claim, including, without limitation, any claim for lost profit and/or loss of goodwill, shall be limited to Distributor's net income after taxes as reported in its annual tax returns filed according to applicable law.

(8)    Subject to the rest of this Agreement, any termination of this Agreement shall be without prejudice to any right that shall have accrued to either party hereunder prior to such termination.

(9)    Neither expiration nor termination of this Agreement shall affect the rights nor responsibilities of the parties with respect to Products sold by Supplier during the term of this Agreement.

D.    NONEXCLUSIVE REMEDY. The right of either party to terminate is not an exclusive remedy, and either party shall be entitled, under appropriate circumstances, alternatively or cumulatively, to damages for breach of this Agreement, to an order requiring performance of the obligations of this Agreement, or to any other remedy available under the laws of any applicable jurisdiction.

14/2/2016

17

## VII.    GENERAL

A.    FORCE MAJEURE.  Without limiting any other term contained herein, Supplier shall not be liable for damages of any kind resulting from delay or inability to deliver, or failure to deliver, caused directly or indirectly by circumstances beyond Supplier's control, including, without limitation, acts of God; Distributor's acts or omissions; acts of any government or any state (foreign or domestic) or political subdivision thereof; riots or civil unrest; war; accidents, fires, floods, explosions, or other catastrophes; lockouts, strikes or labor disputes or shortages; the inability to obtain fuel, power, materials, supplies, equipment, or shipping space; transportation delays, epidemics or quarantine restrictions; severe weather; compliance with, or the operation of, any applicable government legislation, regulation, directive or order of any government (foreign or domestic) or political subdivision thereof, including, without limitation, embargoes or boycotts; judgments or orders of any court of competent jurisdiction; or any other cause or causes, whether similar or dissimilar to the foregoing, beyond Supplier's absolute and unconditional control.  Should such an event hinder performance, Supplier shall immediately notify the other party in writing of the nature of that event and the prospects for Supplier's future performance and shall thereafter, while that event continues, respond promptly and fully in writing to all requests for information from Distributor relating to that event and those prospects. If performance is delayed more than sixty (60) days due to such event or series of events, Distributor may rescind any outstanding orders without liability.

B.    WAIVERS AND AMENDMENTS.

(1)    The delay or failure by either party to exercise or enforce any of its rights under this Agreement shall not constitute or be deemed a waiver of that party's right thereafter to enforce those rights, nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  No extension of time for performance of any obligation or act shall be deemed an extension of the time for performance of any other obligation or act.  Except as specifically provided herein, the exercise of any remedy provided in this Agreement shall not be a waiver of any other remedy provided by law.

(2)    This Agreement shall not be orally modified, amended, or supplemented, and no agreement to allow this Agreement to be modified orally shall be valid or binding unless made in a writing duly executed by Supplier and Distributor.  Terms and conditions inconsistent with this Agreement that are contained in purchase orders, order confirmations, or similar documents shall not be valid or binding.

C.    SEVERABILITY.  If any provision of this Agreement is held to be void, the remaining provisions shall remain valid and shall be construed in such a manner as to achieve their original purposes in full compliance with the applicable laws and regulations.

D.    SOLE AGREEMENT. This Agreement, together with the Confidentiality Agreement, is intended to be the sole and complete statement of the obligations and rights of the parties as to all matters covered by this Agreement, and supersedes all previous understandings, agreements, negotiations and proposals relating thereto.  No other agreement, statement, promise, proposal, tender, or letter agreement related to the subject matter of this Agreement or the Confidentiality Agreement that is not contained herein or therein, respectively, shall be valid or binding.  This Agreement supersedes all prior distributor agreements entered into between the parties.

12/2/2019

18

E.    PERFORMANCE ON BUSINESS DAY.  If the time for performance of any act required under this Agreement falls on a day other than a regular business day in Miami, Florida, the time for performance of such act shall be extended to the first regular business day thereafter.

F.    FURTHER ACTS.  The parties agree to execute and deliver such further instruments and documents and to diligently undertake such further actions as may be required in order to consummate the transactions herein contemplated and to carry out the intent and purpose of this Agreement.

G.    SUCCESSORS AND ASSIGNS.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors.  Distributor shall not appoint sub-distributors nor agents for the sale of the Products in the Territory, and Distributor shall not assign, delegate, or subcontract, in whole or in part, this Agreement, or any rights, obligations, or duties hereunder without the prior written consent of Supplier, in its sole discretion.  Any such assignment, delegation or subcontracting without the consent of Supplier shall be null and void, and shall not relieve Distributor of its obligations hereunder.  Supplier shall have the right to assign its rights and delegate its duties with respect to any order hereunder to any of Supplier's affiliates.

H.    WRITTEN COMMUNICATIONS.    All notices, orders and other communications provided for hereunder shall be in writing and shall be delivered by mail, telex, telegram or cable, as to each party hereto, at its address set forth on the first page of this Agreement or at such other address as shall be designated by such party in a written notice to the other party. All such communications shall be effective upon receipt.

I.    EXECUTION IN COUNTERPARTS.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement.

J.    EFFECT OF HEADINGS.  The headings to the Sections, Schedule A, of this Agreement shall not affect the construction of this Agreement.

K.    FEES AND COSTS.  If the Distributor purchases product directly from Supplier, then Distributor agrees to pay all fees, costs and expenses, including, without limitation, attorneys' fees, costs and disbursements which Supplier incurs in order to repossess and/or secure payment for the Products and/or to collect any sums due from Distributor to Supplier hereunder. Distributor is solely responsible for any fees and costs to secure payment from Distributor's customers.

L.    ATTORNEYS' FEES.  Subject to subsection VII. K. above, if either party commences any action or proceeding against the other party to enforce this Agreement, each party in such action or proceeding shall be responsible for their own attorneys' fees, costs and expenses, in connection with such action or proceeding and in connection with enforcing any judgment or order thereby obtained, regardless of which party prevails.

M.   DISPUTES AND GOVERNING LAW.
     (1)   This Agreement and the performance hereunder shall be governed by and construed in accordance with the substantive laws of the State of Florida, USA, without reference to conflicts of law principles. The parties expressly exclude the applicability of the United Nations Convention on Contracts for the International Sale of Goods.
     (2)   All disputes arising in connection with this Agreement or in connection with any other agreement or transaction between the parties to this Agreement, including without limitation any difference or despite regarding the interpretation of this Agreement or any other agreement between the parties hereto, whether or not such other agreement is related or ancillary to this Agreement, or any relationship of the parties hereto, whether or not related to the subject matter of this Agreement, shall be fully and finally settled through international arbitration under the rules of the American Arbitration Association, by one arbitrator, and appointed in accordance with said rules. The situs of the arbitration shall be Miami, Florida, United States of America. Arbitration proceedings shall be conducted in English. Once the arbitration hearing is commenced, it shall remain in session during the normal business hours for each following business day (weekends and United States holidays excepted), until concluded. The arbitrator shall issue an award along with a written, reasoned opinion, within thirty days of the conclusion of the arbitration hearing. The parties agree that the arbitration, the award and its terms, and the arbitrator's written opinion shall be confidential.

     (3)   The award and any order of the arbitrator shall be final and binding on all parties to such arbitration and judgment thereon may be entered in any court having jurisdiction thereof.

     (4)   Each party consents to the personal and subject matter jurisdiction of the arbitration proceedings as provided herein and waives any defense based upon forum nonconveniens or lack of personal or subject matter jurisdiction.

     (5)   Each party acknowledges, agrees and represents that the provisions contained in Section J with respect to governing law, arbitration, choice of venue and jurisdiction, as well as the remaining provisions of this Agreement, have been negotiated and entered into voluntarily after consultation by each party with its legal counsel and with a full understanding of the business and legal consequences of such provisions and this Agreement.

N.   GOVERNMENTAL APPROVAL.   As promptly as possible after execution of this Agreement, Distributor agrees to submit copies of this Agreement to any governmental agency in any country in the Territory where approval of a distributorship agreement is necessary and agrees to promptly prosecute any such application diligently. This Agreement shall only become effective in such country or countries upon receipt of appropriate approval from the applicable governmental agency.

O.   GOVERNING LANGUAGE.   This Agreement is in the English language. No translation of this Agreement into any language other than English shall be considered in the interpretation thereof and in the event that any translation of this Agreement is in conflict with the English language version, the English version shall govern.

12/2/2019

20

P.    BLOCKED CURRENCY.

(1)    In the event that any payment required to be made to Supplier pursuant to this Agreement cannot be made when due because of the exchange control of any country in the Territory and such payment remains unpaid for twelve (12) months, Supplier may, by notice served to Distributor, elect any of the following alternative methods of handling such payment:

(a)    If the currency can be converted into currency other than U.S. Dollars for purposes of foreign remittance, Supplier may elect to receive such payment in any such currencies as it may specify and, in such case, the amount payable in the foreign currency so selected shall be determined by reference to the then existent legal rate of exchange which is most favorable to Supplier.

(b)    Supplier may elect to have payment made to it in the local currency, deposited to the credit of Supplier in a bank account in such country designated by Supplier, in which event Distributor shall furnish to Supplier evidence of such deposit.

(c)    Supplier may elect to receive payment in shares of stock in the Distributor Corporation at such price as Supplier and Distributor may agree to at such time.

(2)    All expenses of currency conversion and transmission shall be borne by Distributor and no deduction shall be made from remittances on account of such expense. Distributor from time to time may prepare all applications, reports or other documents, which may be required by the government of the applicable country in order that remittances may be made in accordance with this Agreement.

Q.    NOTICE.    Any notice required or permitted to be given with regard to this Agreement shall be in writing and shall be deemed given five (5) days after delivery to Federal Express, or other express delivery service, charges prepaid, addressed to President in the case of any notice to Supplier and to in the case of Distributor at their respective addresses first written above, or to such other representative at such other address as either party may designate by written notice as provided herein.    Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to constitute receipt of the notice, demand, request or communication sent.

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal the day indicated.

NATS Inc.                                          Radiation Shield Technologies, Inc.

By:    Dr. Awateef Gacem                  By:    Ronald F. DeMeo, M.D.
Title:    President                               Title:    CEO and President
Date:    December 2, 2019                  Date:    December 2, 2019

## SCHEDULE A

**1.    List Goods, Accessories, and Spare Parts**
The following DEMRON™ radiation attenuation Goods, Accessories and Spare Parts form part of this Agreement:

DEMRON Full Body Suit
DEMRON Class 2 Suit
DEMRON ICE Suit
DEMRON One-ply Torso Vest
DEMRON Two-ply Torso Vest
DEMRON Two-ply Triage Blanket
High Energy Nuclear/Ballistic IED RDD Shield

**2.    Trademarks**
The following Trademarks form part of this Agreement:

DEMRON™
RST™

**3.    Territory**
The following shall form the Territory:

World Wide

22



**Radiation Shield Technologies**

## MUTUAL CONFIDENTIALITY
## AND NONDISCLOSURE AGREEMENT

THIS MUTUAL CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT is made and entered into this 2nd day of December, 2019 (the "Effective Date") by and between RADIATION SHIELD TECHNOLOGIES, INC., a Delaware corporation ("RST"), and **NATS INCORPORATED** ("Company") with its headquarter offices at : 511 Centerpoint Drive, Middletown, CT 06457.

### W I T N E S S E T H :

**Whereas**, the Company has expertise as a distributor;

**Whereas**, RST possesses certain patent and/or other intellectual property rights pertaining to the production of both traditional and nano-based radiation blocking products; and in the lamination, injection molding, thermaforming and compounding of various materials to its products, including but not limited to chemical and biological resistant films and rubber; and

**Whereas,** the parties desire to evaluate a possible business relationship or transaction between RST and the Company, whereby the Company may perform tests on ballistic resistant personal body armor for RST (the "Proposed Transaction") and whereby the parties may provide certain confidential information to each other concerning their respective proprietary information, business, financial condition, and operations.

**In consideration thereof**, the parties agree as follows:

1. **Evaluation Material.**

    1.1.    As used herein, the term "Evaluation Material" means any of the following types of information: (i) all data, know-how, formulae, processes, technology, ingredients, methods, procedures, inventions, ideas, business methods, business practices, business concepts, client lists, information, research, samples, models, prototypes, reports, analyses, notes, interpretations, forecasts, records, documents, agreements and information which are proprietary to a party, which are not generally available to the public, which the disclosing party or its Representatives (as defined below) will provide or previously has provided to the receiving party or its Representatives in connection with the Proposed Transaction, and/or which the receiving party or its Representatives receive or receive knowledge of or access to in connection with the Proposed Transaction, at any time and in any form, whether or not expressly marked as proprietary or confidential;

866.7DEMRON
866.733.6766

F: 866.5DEMRON
866.533.6766

P.O. Box 14-4254
Coral Gables, FL 33114

Initial_____ Date_____    Initial_____ Date 12/2/2019

www.RadShield.com

(ii) all notes, analyses, compilations, studies, interpretations or other documents and all copies thereof prepared by either party or its Representatives, which contain, reflect or are based upon, in whole or in part, any of the information which is described in the preceding clause (i); and (iii) the content and substance of any discussions or negotiations between the parties (or its Representatives) and the fact that such discussions or negotiations have taken place. The term "Evaluation Material" does not include information that (a) is or becomes generally available to the public other than as a result of a disclosure by the receiving party or its Representatives; (b) a party can show was within its possession prior to its being furnished to such party by or on behalf of the other; (c) was received by a party on a non-confidential basis from a third party; or (d) is independently developed by a party without the aid, application or use of the Evaluation Material.

1.2.    As used herein, the term "Representatives" means, collectively, the respective directors, officers, employees, agents, attorneys, professionals, or technical consultants of each party, as the context requires.

1.3.    As used herein, the term "person" shall be broadly interpreted to include without limitation any corporation, partnership, joint venture, trust, or individual.

1.4.    The parties acknowledge that all Evaluation Material is the exclusive property of the disclosing party and that the receiving party shall have no proprietary interest therein. Each party will use the other party's Evaluation Material solely for the purpose of evaluating the Proposed Transaction and shall not use any Evaluation Material in any way directly or indirectly detrimental to the disclosing party. A receiving party may disclose the Evaluation Material of the other or portions thereof only to those of its Representatives who need to know such information for the purpose of evaluating the Proposed Transaction and who agree to keep such information confidential.

1.5.    The receiving party and its Representatives shall keep confidential all Evaluation Material of the disclosing party. Each party will inform each of its Representatives of the confidential nature of the Evaluation Material and of the provisions of this agreement, and will cause each such Representative to agree to comply fully with the restrictions on use of the Evaluation Material contained in this agreement. Each party will be responsible for any breach of this agreement or improper use of Evaluation Material by any of its Representatives of by any other person to whom information is provided by such party or its Representatives.

12/2/2019

2

**1.6.**    Without the prior written consent of the other party, each of the parties agrees that it will not, and will direct its Representatives not to, disclose to any person either the fact that any investigations, discussions or negotiations are taking place concerning a possible business relationship or transaction, that either party has requested or received Evaluation Material from the other, or any of the terms, conditions, or other facts with respect to any such business relationship or transaction, including, but not limited to, the status thereof and the terms or provisions of any proposal or offer made by either party, whether written or oral.  Either party may only make such disclosures required by applicable securities laws as are necessary to comply therewith or with the rules and regulations of any applicable stock exchange.


**2.**    **Samples/Models/Prototypes/Assignment.**

**2.1.**    The receiving party shall not, without prior written consent of the disclosing party test, evaluate, or use for purposes other than set forth in this agreement any samples, models, prototypes, or other Evaluation Materials provided by the disclosing party.  Further, the receiving party shall not, without the express written consent of the disclosing party, analyze, reverse engineer, decompile, dissemble, sell, transfer, disclose, or publish such samples, models, prototypes, or other Evaluation Material.  Unless a separate Joint Development Agreement has been established between both parties, any modification, improvements, or re-engineering of RST's technology whether patentable or not shall be wholly and unconditionally assigned to RST.

**2.2.**    However, the receiving party may conduct testing in order to determine the performance and suitability of the samples, models, prototypes, or other Evaluation Material for processing on its equipment, in order to evaluate the results and whether the finished product contains certain desired properties, and/or for such other limited purposes as contemplated by the parties as of the date of this agreement.  Each party permits the other to conduct such testing provided that such testing shall be limited to what is reasonably necessary for the Proposed Transaction and that the receiving party shall not disclose the results of such testing to any third party without the prior written consent of the disclosing party.

**2.3.**    Any improvements, modifications, re-designs, or new applications of RST materials performed by Company or any of its officers or employees pursuant to the Proposed Transaction, patentable or not, will be wholly and unconditionally assigned to RST.  Any and all test data and know how regarding the proposed project shall be fully disclosed to RST and be the property of RST.  No test results or know how regarding the proposed project shall be disclosed by the Company without RST's written consent.  Such consent can only be given by the Chief Executive Officer of RST.

12/2/2019

3

3.    **Compelled Disclosures.**

   **3.1.**    In the event that Company, or any of its Representatives, becomes legally compelled (e.g., by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) to disclose any of RST's Evaluation Material, such party shall provide RST with prompt prior written notice of such requirement so that RST may seek a protective order or other appropriate remedy and Company shall cooperate fully with the RST's efforts to obtain any such relief. In the event that such protective order or other remedy is not obtained, Company will provide only that portion of the Evaluation Material that it is advised by written opinion of counsel is legally required. Such disclosure may expose Company to any liability under this agreement if such disclosure was caused by, or resulted from, a previous disclosure by such party or its Representatives that was not permitted by this agreement.

   **3.2.**    The disclosing party agrees to exercise its best efforts to obtain a protective order or other reliable assurance that confidential treatment will be accorded such Evaluation Material. The party being compelled to make disclosure shall be reimbursed for all reasonable expenses incurred by it or its Representatives in complying with this paragraph 3, except to the extent such amounts are recoverable from the party compelling disclosure.  Such party agrees to exercise its best efforts to recover all expenses that are recoverable from the party compelling disclosure.

4.    **Treatment of Information.**

   **4.1.**    If at any time either party requests, the other party promptly will return to the requesting party all copies of such party's Evaluation Material in its possession or in the possession of its Representatives, will destroy all copies of any analyses, compilations, studies, or other documents prepared by it or for its use containing or reflecting any such Evaluation Material, and will furnish the requesting party with prompt written confirmation of such destruction.

   **4.2.**    Notwithstanding the return or destruction of any Evaluation Material, the parties will continue to be bound by their confidentiality and other obligations under this agreement.

5.    **No Obligation With Respect to Negotiations.**

   **5.1.**    The parties understand and agree that no contract or agreement providing for any business relationship or transaction shall be deemed to exist unless and until a definitive written agreement (a "Definitive Agreement") has been executed and delivered, and each party hereby waives, in advance, any claims (including, without limitation, breach of contract, quantum meruit, and unjust enrichment) in connection with any such business relationship or transaction unless and until the parties shall have entered into a Definitive Agreement.    Ỡ  12/2/2019

4

**5.2.**    Each party also agrees that unless and until a Definitive Agreement with respect to any business relationship or transaction is executed and delivered, neither party will have any legal obligation of any kind with respect to any such business relationship or transaction by virtue of this agreement or any other written or oral expression with respect to such transaction except, in the case of this agreement, for the matters specifically agreed to herein.

**5.3.**    The term "Definitive Agreement" does not include an executed letter of intent or any other preliminary written agreement, nor does it include any written or verbal agreement in principle or acceptance of an offer or bid, except to the extent therein otherwise provided.

**5.4.**    Each party reserves the right to reject any and all proposals made by the other or any of its Representatives with respect to a business relationship or transaction or otherwise and to terminate negotiations and discussions with respect thereto at any time.    Each party's obligations under this agreement will survive any such rejection or termination.

**6.    Miscellaneous.**

**6.1.**    The parties understand and agree that this agreement shall be for the benefit of the parties hereto, as well as for the benefit of RadGuard, Inc. and Meridian Research and Development, Inc., affiliates of RST.  The parties further agree that this agreement shall be for the benefit of the parties and their directors, officers, stockholders, owners, affiliates, and agents.

**6.2.**    The parties agree that this agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

**6.3.**    Every provision of this agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the remainder of this agreement.

**6.4.**    The term of this agreement shall be a period of two (2) years from the date of this agreement; provided that any Evaluation Material that constitutes a "trade secret" under the Florida Uniform Trade Secrets Act and/or is identified by RST in writing to Company as such, shall be kept confidential as long as required under such Act.

**6.5.**    The parties agree that money damages would not be a sufficient remedy for any violation of the terms of this agreement, and, accordingly, that the parties shall be entitled to seek equitable relief, including injunctive relief and specific performance in the event of any breach of the provisions of the agreement, in addition to all other remedies available at law or in equity.

**6.6.**    It is understood and agreed that no failure or delay in exercising any right, power or privilege hereunder will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

12/2/2,19

7. **Governing Law; Arbitration; Choice of Venue; Consent to Jurisdiction.**

     **7.1.**    This Agreement and the performance hereunder shall be governed by and construed in accordance with the substantive laws of the State of Florida, without reference to conflicts of laws principles.

     **7.2.**    All disputes arising in connection with this Agreement, or in connection with any other agreement or transaction between the parties to this Agreement, including without limitation any difference or despite regarding the interpretation of this Agreement or any other agreement between the parties hereto, whether or not such other agreement is related or ancillary to this Agreement, or any relationship of the parties hereto, whether or not related to the subject matter of this Agreement, shall be fully and finally settled through arbitration under the rules of the American Arbitration Association, by one arbitrator appointed in accordance with said rules. The situs of the arbitration shall be Miami, Florida, United States of America. Arbitration proceedings shall be conducted in English. All costs of the arbitration shall be the sole responsibility of each party, including without limitation attorneys' fees, costs and witness expenses. Once the arbitration hearing is commenced, it shall remain in session during the normal business hours for each following business day (weekends and United States holidays excepted), until concluded. The arbitrator shall issue an award along with a written opinion within thirty (30) days of the conclusion of the arbitration hearing. The parties agree that the arbitration, the award and its terms, and the arbitrator's written opinion shall be confidential.

     **7.3.**    The award and any order of the arbitrator shall be final and binding on all parties to such arbitration, and judgment thereon may be entered in any court having jurisdiction thereof.

     **7.4.**    Each party consents to the personal and subject matter jurisdiction of the arbitration proceedings, as provided herein, and waives any defense based upon forum nonconveniens or lack of personal or subject matter jurisdiction.

     **7.5.**    Each party acknowledges, agrees and represents that the provisions contained with respect to governing law, arbitration, choice of venue and jurisdiction, as well as the remaining provisions of this Agreement, have been negotiated and entered into voluntarily after consultation by each party with its legal counsel and with a full understanding of the business and legal consequences of such provisions and this Agreement.

     **IN WITNESS WHEREOF,** the parties have executed this agreement as of the date first above written.

**NATS Incorporated**                **Radiation Shield Technologies, Inc.**

By:    Dr. Awateef Gacem             By:    Ronald F. DeMeo, M.D.
Title:  President                  Title:  CEO and President
Date:  December 2, 2019           Date:  December 2, 2019

6